DODGE *v.* STATE NATIONAL BANK.

Opinion delivered July 14, 1910.

1. INSURANCE—CONSPIRACY TO SECURE STATE LICENSE—LIABILITY.—It appears that if a bank conspires with an insurance company to represent falsely to the Auditor of State that the insurance company has on deposit with the bank the sum of $50,000 for the purpose of inducing the Auditor to grant a license to the insurance company to transact business in the State, and the Auditor, upon such representation, grants the insurance company license, in a suit by the Auditor under Kirby's Digest, § 4430, subdiv. 8, or in a suit by a receiver of the insurance company under Kirby's Digest, §§ 950, 954, the bank will be estopped by its conduct from denying that the insurance company had such a sum of money on deposit at the time the license was issued. (Page 73.)

2. BANKS AND BANKING—LIABILITY OF BANK.—The directors of a stock fire insurance company, being required to raise $50,000 paid up capital before a license could be obtained, each executed a joint note to the company for that amount, which was good for that amount, and was transferred to a bank, which loaned that sum to the insurance company. Upon the faith of this deposit, an annual license was issued to the insurance company. The next day the note was taken up by the insurance company, and held for the remainder of the year. The Auditor of State knew these facts, and tacitly acquiesced in what was done. *Held* that the proceeds of the note did not constitute a trust fund in the bank's hands, nor render it liable upon the subsequent insolvency of the insurance company. (Page 75.)

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; affirmed.

STATEMENT BY THE COURT.

This suit was brought by appellant, as receiver of the People's Fire Insurance Company, against appellees, State National

Bank and L. W. Cherry. When the suit was instituted, R. S. Hamilton was also a party defendant, but his death abated the suit as to him. We will hereafter designate the State National Bank as the "Bank," and the People's Fire Insurance Company as "Insurance Company." L. W. Cherry was president of the Bank, and R. S. Hamilton was its cashier.

The complaint in substance alleged that on the 5th day of March, 1905, the Insurance Company had on deposit with the Bank a paid-up capital of $50,000; that on that day by virtue of said capital paid in and on deposit in the Bank and the presentation to the Auditor of State of a certificate of deposit to that effect he was induced to and did issue to the Insurance Company a certificate to do business as a stock fire insurance company in the State of Arkansas; that on the next day the appellees conspired with the secretary of the Insurance Company to withdraw from deposit the $50,000 which had been deposited to the credit of the Insurance Company, and which constituted its only paid-up capital; that the money by this conspiracy was withdrawn without the consent of all the stockholders of the Insurance Company; that such withdrawal was illegal; that the Insurance Company held out to the public that it had a paid-up capital of $50,000, and on the faith of such representation the public was induced to take out policies of fire insurance, and to transact business with the Insurance Company; that the withdrawal of the $50,000 was a deceit and fraud upon the rights of the creditors and stockholders of the Insurance Company because it rendered the Insurance Company insolvent though it continued to do business some two years after the withdrawal of the $50,000; that appellees stood by and permitted obligations to be made and liabilities to accrue on the faith of the representations of the Insurance Company that it had on deposit with the Bank the sum of $50,000 as paid-up capital. The complaint further alleged that the $50,000 on deposit with the Bank was a trust fund for the benefit of creditors; that appellees knew that it was a trust fund, and that in law appellees now have in their hands the sum of $50,000 and the profits arising therefrom.

The prayer was that the defendants be required to pay into court, for the use and benefit of the creditors and stockholders of said Insurance Company, said $50,000 and prof-

its arising therefrom from March 6, 1905, so that the same might be apportioned among the creditors and stockholders with the other funds and assets which the receiver had in his hands as such receiver, for costs and all other relief.

The Bank filed a separate answer, denying that on March 6, 1905, it, with Cherry and Hamilton, conspired with the secretary of said Insurance Company to withdraw a deposit, or that said deposit was withdrawn without the consent of said company, or was in any manner withdrawn illegally, and alleging that said company was one of its depositors in 1905, and placed its deposits there, like all others, subject to check, and that all its deposits were in due course of business so drawn out by it through its duly credited officers, and that from time to time its deposit book was balanced and all checks returned; and denying that it holds $50,000, or any sum, belonging to said company, and the profits thereof; denying that it has been guilty of conspiracy with Cherry, Hamilton and said secretary in deceiving the public or in taking or keeping the moneys of said company, and alleging that the charges of plaintiff are wholly false and untrue as to it.

Cherry answered, denying that he, with said bank and Hamilton, conspired with said secretary, or with any one, to withdraw said deposit or any deposit; alleging upon information that all moneys deposited were withdrawn on proper checks of the officers of said company, with all of which he had nothing to do; denying that he alone, or with any one, drew from said bank said sum or any sum, and denying that he was a party to any fraud or deceit upon the creditors or stockholders of said company, or any one else, at any time; denying that he was connected with or responsible for the failure of said company; alleging that he was not an officer or stockholder thereof, and had no right to handle its funds, and did not do so; denying any information as to whether the funds deposited were the paid-up capital of said company, or as to drawing out the same, whether by consent of the stockholders or not; denying that the capital stock of said company was a trust fund, or that any such funds were placed in his hands, or that he ever knew what the capital stock of said company was, never having handled any of same; denying that he alone, or with said

bank, or Hamilton, has or ever had said sum, or the profits thereof; denying that he has been a party to any conspiracy with said Bank, or Hamilton, or said secretary, in deceiving the public or in taking or keeping the moneys of said company, and avers that the allegations of said bill are wholly false and untrue as to him. All other allegations were denied.

The facts are substantially as follows: The Insurance Company was organized as a stock company with Dan W. Jones, W. M. Kavanaugh, A. B. Poe, R. D. Plunkett, W. H. Boone, J. W. Holland and Isaac S. Humbert as its directors. In order to raise the $50,000 paid-up capital required by section 4335, Kirby's Digest, to enable it to do business in the State, its directors, as above, executed a note to the company for $50,000, each individually signing the note. The plan was to present this note to the Auditor of State as paid-up capital and get the license. The note was presented to him, but he refused to issue license on the note, suggesting that they might borrow the money on the note. Holland, the secretary of the company, was authorized to borrow the money. He entered into negotiations with Hamilton, cashier of appellee Bank, and succeeded in borrowing the sum of $50,000. Hamilton testified that the Bank made the loan of $50,000 on either a demand or one day note; that when the note was made it was intended that it should be taken up inside of four days. It remained to the company's credit about one day. The money was subject to check. He thought it was subject to check only for the payment of the note. He did not know whether he would have honored a check for $50,000 except to be applied on the payment of the note. There was no understanding that it should be used for no other purpose. Hamilton further testified as follows: "No understending was entered into between Cherry, myself and the parties signing the note that it should be used to meet the requirements of the company in getting its charter. They said they needed the money in the organization of the company. The $50,000 was not a trust fund to be held by the Bank until withdrawn. The loan was not for the purpose of becoming the paid-up capital of the Insurance Company. I did not understand that it was. I supposed they were going to use it in their organization some way; was informed that the

company had other assets. I received stock to the amount of $1,000. Holland represented that he wanted me to come into the company as a director to help him with the business. That was the consideration for the stock. There was no agreement to the effect that Cherry and myself would loan the company the money so that it could use it in its organization—obtain its certificate from the Auditor. The consideration for the loan was not the certificate of stock issued to us. We paid nothing at the time of the issuance of the stock for it. The Bank received the interest on the note—8 per cent. discount for four days, as I recollect it. The loan was handled as any other loan of the Bank at that time. The application was made about a week before the loan was made. The matter was talked over by myself and Col. Cherry. The loan was made on the recommendation of Mr. Cherry."

Dan W. Jones was president of the Insurance Company. He assisted Holland in making the negotiation for the loan. They were authorized to execute the note for the Insurance Company to the Bank. They did so. The Insurance Company's name was signed to the note by Dan W. Jones, its president, and Holland also signed it. The note signed by the directors to the Insurance Company was attached as collateral to the note executed by the Insurance Company to the Bank. Holland testified that he told Hamilton that they could not organize and establish the company without the $50,000, but did not tell him that the company needed it to pass the Auditor. He told Hamilton they would not draw out the money if they could do without it, but if they needed it would certainly check on it. Jones testified: "There was no agreement with the Bank that the money should remain only a few days, nor was it understood that we were not to use the money. I said I do not think we will ever have occasion to draw on this note, but, understand me, I do not want to deceive you; if it is necessary, if we incur debts, you are liable to pay this money. We had the understanding that it was not to be used except in the case of emergency. It was negotiated the same as any other loan."

Neither Jones nor Holland talked with Cherry about the loan. Cherry, the only other party to the negotiation, testified concerning it: "The note was submitted to me by Mr. Hamil-

ton, who was cashier of the bank at the time. I had the negotiation with Mr. Hamilton only. Hamilton had the negotiation with the parties, and referred the matter to me. I talked with no one about it except Hamilton. Do not know what the object of the loan was. The note was made upon the consideration of the value of the note secured by these parties. The consideration was the obtaining of the banking business of the insurance company and its bank account. The money was placed to the credit of the insurance company. The loan was made like any other loan that comes up there. We took the note, credited the money—the proceeds—to the insurance company's account; that was all there was to it. The note and collateral were held in the bank for the loan. No understanding as to how long the money was to remain in the bank. It was placed subject to the credit of the Insurance Company. It was subject to its check. The money remained a few days, to the best of my knowledge. I was not present when it was paid back to the bank, nor when the note was delivered up. Soon after it was paid I was informed of it. I don't know what they used the money for. They did business with us about a year and a half. They had more money in the bank than the $50,000. Their balance ran from $1,000 to $11,000, and they drew checks on the bank for that money until it was all drawn out. I knew most of the men on the note. I considered them good for $150,000. Would not have made the loan if I had not considered the note good. I understand the negotiations for the loan were between Hamilton, Holland and Jones. Nothing was ever said about the money being placed in the bank as a trust fund, and I knew nothing of a trust fund in connection with it. It was there subject to the check of the People's Fire Insurance Company. No discussion about a certificate from the Auditor or passing the Auditor was ever had in my presence. I know nothing about the license or the obtaining of the license from the Auditor of the State. We looked only to the collateral note for the repayment of the loan. I was never present at a board meeting at which the loan was discussed. I never discussed the loan with any officer or director of the insurance company. I had nothing to do with the negotiation of the loan other than passing upon it when Hamilton reported the application to me."

Three witnesses, towit, Boone, Humbert and Plunkett, testified that Hamilton and Cherry were present at a meeting of the board of directors of the Insurance Company when the question of securing the $50,000 necessary to enable the Insurance Company to secure license was being discussed, and that an agreement was then and there entered into between the directors of the Insurance Company and Hamilton and Cherry that the Bank would furnish the Insurance Company $50,000 to enable it "to pass the Auditor."

Plunkett testified: "It was agreed and understood in the meeting that we were to hold the money long enough to get our charter, which we did. This was discussed in the presence of Cherry and Hamilton." Boone testified that "the loan and deposit was made in the Bank for the purpose of passing the State Auditor. It constituted the capital stock of the Insurance Company, and was sworn to in order to get our charter. It was to remain there in the Bank as capital stock." All of these witnesses testify that, in consideration of the Bank furnishing the $50,000, the Insurance Company was to issue $1,000 of its stock each to Cherry and Hamilton. Humbert testified that "the $50,000 was the capital stock of the Insurance Company." "I do not know," he says, "what understanding was had about it staying in the Bank." Two other witnesses, towit, Poe and Kavanaugh, testified that Cherry and Hamilton were to receive a commission each of one thousand dollars of stock of the Insurance Company for securing the loan of $50,000 from the Bank. But both of these witnesses state that their testimony as to Cherry and Hamilton receiving the two thousand of stock of the Insurance Company as a commission was based on what was told them, and on reports to the board after the Auditor had granted the Insurance Company license. On the other hand, Holland, Jones, Hamilton and Cherry all testify that the stock given to Hamilton and Cherry had no connection with the loan whatever, that it was given them after the loan had been consummated, and that this stock was given them to interest them in the Insurance Company, so as to give the Insurance Company, if possible, the fire insurance which these gentlemen controlled, and to give the company business prestige by having such business men interested in and connected with it.

It was shown in evidence that the $50,000 remained on deposit in the Bank to the credit of the Insurance Company one day. The records of interest and discount on the books of the Bank were examined, and did not show that any interest was paid on the $50,000 note of the Insurance Company during the month of March, 1905. The note of the Insurance Company to the Bank was paid by check of the Insurance Company signed in the usual way by its president, secretary and treasurer. The note was surrendered with its collateral to the Insurance Company. The collateral note was kept by the secretary of the Insurance Company until the next annual license was obtained. The next license was obtained upon a showing made to the Auditor that R. D. Plunkett had deeded to the Insurance Company land worth the sum of $50,000. Plunkett took stock of the Company to the amount of $50,025 for his land. It was shown that the Auditor knew that the $50,000 deposited with the Bank by the Insurance Company had been taken down, but he did not require of the Insurance Company any additional security, let the matter run on until the next annual license was issued, when it was shown that the Insurance Company had a deed to land worth $50,000. The company continued to transact business for some time thereafter. It was declared insolvent, and went into the hands of a receiver the 19th day of January, 1907. The evidence is undisputed that the note executed to the Insurance Company for $50,000, signed by A. B. Poe, R. D. Plunkett, W. M. Kavanaugh, W. H. Boone, J. W. Holland, Dan W. Jones, I. S. Humbert and W. T. Brown, and deposited as collateral with the Bank, was worth at least $50,000. The court dismissed the complaint for want of equity.

*Robt. L. Rogers* and *Downie, Rouse & Streepy,* for appellant.

The purpose of the statute (Kirby's Dig. § § 4335, 4336, 4337 and 4338) is to afford better security to members and policyholders. 33 N. Y. 437; 88 Am. Dec. 386. An action against a corporation may be maintained to recover damages caused by a conspiracy. 106 N. Y. 669; 12 N. E. 825; 68 Ark. 305; 15 Ohio, 659; 45 Am. Dec. 596; 25 Barb. 583; 97 Ga. 673; 36 L. R. A. 631; 109 Mo. 446; 19 S. W. 248.

*B. S. & J. V. Johnson* and *Marshall & Coffman,* for appellees.

The money borrowed was merely assets belonging to the company. 16 S. C. 524. The trust fund doctrine does not apply to anything but unpaid stock subscriptions. 17 Wall. 610; 139 U. S. 96; *Id.* 118; *Id.* 417; 50 *Id.* 371; 59 Ark. 562. Some direct connection between the bank and appellant is essential to a recovery. 50 C. C. A. 623; 57 L. R. A. 108. No other penalty can be exacted or enforced than that provided by the act. 49 L. R. A. 523. No one has a right to rely on a representation except the one sought to be influenced by it. Cooley on Torts, 493; Kerr on Fraud, 93; 96 N. Y. 100. When an agent acts for himself, he does not bind his principal. 63 Ark. 418; 69 Ark. 140.

*Robt. L. Rogers* and *Downie, Rouse & Streepy,* in reply.

Appellee made the fraud possible and is liable for the damages caused thereby. 109 Mo. 446; 19 S. W. 248. The principal is civilly liable for the frauds committed by his agent in the course of his employment. Clark & Skyles on Agency, 1103; 139 N. Y. 290. The receiver, as the representative of creditors, may maintain an action to recover assets belonging to a corporation. High on Receivers, § 315; Beach on Receivers, 4967; 72 N. Y. 275; 20 L. R. A. 86.

WOOD, J., (after stating the facts). Under the provisions of chapter 90, Kirby's Digest, the Auditor of State is charged with the duty of seeing that "all the laws of the State respecting insurance companies are faithfully executed." To this end he "is impowered to appoint and commission actuaries and examiners to issue and, upon cause shown, to revoke licenses or permits to transact business of insurance, and, when legal cause exists, to suspend the business of any company of this State; * * * to require free access to books and papers belonging to any such company or companies; to summon and examine persons relative thereto," etc. Kirby's Dig. § § 4326-30.

"No insurance company shall be allowed to transact business of insurance in this State until it shall have a *bona fide* subscribed capital of not less than one hundred thousand dollars, with a paid-up capital of not less than $50,000. Section 4335, Kirby's Dig. Other sections prescribe severe penalties against persons, companies or corporations for transacting the business

of insurance without complying with the law. Subdivisions eight, nine and ten of section 4330 of Kirby's Digest prescribe the methods of procedure on the part of the Auditor to cancel the license or suspend the business of an insurance company that is 'insolvent or fraudulently conducted.' The purpose of all these provisions of the law is to protect the public, who insure, against worthless insurance companies, and the Auditor of State, who is designated by law to represent the public, is clothed with plenary power in the premises. If the Bank conspired with the Insurance Company to falsely represent to the Auditor of the State that the Insurance Company had on deposit with the Bank the sum of $50,000 for the purpose of inducing the Auditor to grant a license to the Insurance Company to transact business, and if the Auditor upon such representation granted the Insurance Company license, then the bank would be estopped by its conduct from denying that the Insurance Company had such sum of money on deposit with it at the time the license was issued.

In a suit at the instance of the Auditor under section 4330, division eighth, Kirby's Digest, or by the receiver under sections 950 and 954, to recover such sum as an asset of the insolvent insurance company the bank would be estopped from denying that it held such sum as an asset of the insurance company. This is the doctrine of *Ellerbe* v. *Exchange National Bank*, 109 Mo. 446, upon which appellant relies. In that case the cashier of the bank exhibited to the insurance commissioner a false entry of deposit showing that the insurance company had to its credit a certain sum, when in fact the amount was $21,500 less than the sum certified. The false certificate was made for the purpose of enabling the insurance company to pass the insurance commissioner. In a suit by the insurance commissioner against the bank to hold the latter liable for the $21,500 as an asset of the insolvent insurance company, the court held that, the bank having certified and exhibited books to show that the insurance company had on deposit with it a certain sum of money for the purpose of enabling the company to secure license to transact business, and license having been obtained upon such representation enabling the insurance company to transact business and to create obligations, under these circumstances the

bank would not be heard to say that it did not have the money as represented. The bank accordingly was held to account for the money as an asset of the insurance company. The doctrine of that case is sound, but it has no application here. For this case differs radically in its facts from that. Here the complaint alleges, and the proof shows, that at the time the secretary of the insurance company exhibited to the Auditor its pass book, or deposit slip, showing that the Insurance Company had on deposit with the Bank the sum of $50,000, such was the fact. This representation was true. While witnesses on behalf of appellant testify that the understanding between the officers of the Insurance Company and the Bank was that the latter should furnish the money to enable the former to pass the Auditor, not one testifies that the loan in fact was not made. Not one testifies that the loan was not made upon the faith of the collateral which was put up to secure it. Only one (Plunkett) testified that the Insurance Company did not obtain possession of the money. But all of the other testimony shows he was mistaken; and indeed the allegations are that the Insurance Company had on deposit with the Bank the sum of $50,000. The deposit slip and the books of the Bank and all the witnesses (except Plunkett) show that the loan was made and the money passed to the credit of the Insurance Company, and was on deposit to its credit when the secretary of the Insurance Company exhibited to the Auditor the deposit slip. So, even if this slip be taken as a representation or certification by the officers of the Bank to the Auditor that the Insurance Company had on deposit with it the sum of $50,000, such representation was true, and the Auditor was not and could not have been deceived and defrauded by such representation. Now, if there was a *bona fide* loan of $50,000 from the Bank to the Insurance Company, the Bank could not be liable because the officers of the Insurance Company used the $50,000 as paid-up capital to obtain its license from the Auditor, nor could it be liable because the officers of the Insurance Company afterwards used the same $50,000 to repay the Bank. The Bank had the right to loan the Insurance Company the money, and it also had the right to accept payment of the loan, even though it knew that the Insurance Company was using its capital stock in making the payment. If

the Insurance Company, after obtaining its license, reduced its capital stock below the amount required, the Auditor could have had its license cancelled. He had full power, as we have seen, under the statutes *supra,* and it was his duty, to make inquiries and to ascertain the facts and to protect the public against a condition of that kind. That was no concern of the Bank. There is no evidence to sustain the allegation that the Bank accepted the money of the Insurance Company and was to keep it on deposit as a trust fund. The attempt to hold the Bank and Cherry for the unawful diversion or conversion of a trust fund must fail. There are no allegations that the officers of the Insurance Company and the officers of the Bank entered into a conspiracy to procure a license from the Auditor for the Insurance Company to transact business, and that such license was procured upon a false representation, made in pursuance of this conspiracy, that the Insurance Company had on deposit with the Bank the sum of $50,000.

These allegations, if made with the others in the complaint, would have brought the case within the rule announced in the case of *Ellerbe* v. *Exchange Nat. Bank, supra.* Appellant now contends, however, that the evidence at the hearing developed the whole transaction, and that the so-called loan and deposit was a mere subterfuge to deceive the Auditor and to defraud the public. The evidence does not warrant such conclusion. The officers of the Insurance Company were authorized to negotiate just such loan for the purpose of securing the $50,000 needed for its paid-up capital. The directors not only authorized the loan, but individually signed a note to the Insurance Company which was to be used in procuring the license or the money itself, if the Auditor would not accept the note. This note was *bona fide,* and saves the whole transaction from the taint of fraud. It is undisputed that the note was worth the sum of fifty thousand dollars, for which it was hypothecated. Cherry knew the men on the note, and considered them good for $150,000. The officers of the Bank took the note as collateral, and made the loan. There is no evidence that the officers of the Bank would have made the loan without this collateral note. That made the Bank secure. After the note to the Bank was paid, the secretary of the Insurance Company held this

note of the directors to the Bank as an asset of the company, he says, until the next annual license was issued. While this note was not paid-up capital, in the strict sense, because it was not actually paid, yet there was not a day from the time it was executed until the next annual license was issued that the sum of fifty thousand dollars could not have been realized out of the note. The Auditor seems to have been so well satisfied of this that he did not "make any fuss about it," and let the company go on, although he knew that the money on deposit as the Insurance Company's paid-up capital had been withdrawn. The Auditor had correctly held that the paid-up capital did not have to be cash, but might be in an investment in land or other assets of the value of $50,000. The officers of the Insurance Company, after the license had been obtained, concluded that the individual note of the directors to the Insurance Company was an asset that was worth to the company the full sum of $50,000 required by the law to be paid up. Doubtless, if the Auditor had required it, they could have secured at any time the sum of $50,000 on the note. Hence they concluded to pay off the note to the Bank that was bearing interest against the Company and to take up and hold the collateral note which was bearing interest in the company's favor. This was done without the direct authority of the Auditor in advance, but since he knew about it, and did not object to it, and was the only one who could object to it, the company had his authority by acquiescence, and the public was not therefore defrauded or imposed upon by this act of the officers of the Insurance Company in paying off the note to the Bank, and in taking and holding the note of the directors to the Insurance Company. Suppose the officers of the Insurance Company had converted the note into land or money or some other asset, which they doubtless could have done. The result would have been the same. Instead, they held the note till the next annual premium day when the Auditor approved a deed to land from one of the signers of the note to the Insurance Company, estimated by him to be worth the sum of $50,000, as paid-up capital of the Insurance Company and issued license. A clear preponderance of the evidence shows that neither Hamilton nor Cherry was present at a meeting of the board of directors of the Insurance Company

when the matter of making the loan was discussed. While some of the witnesses say they were present at such meeting, the greater number of witnesses show that they were not present at such meeting.

We are of the opinion that the testimony of Hamilton and Cherry, representatives of the Bank which made the loan, and the testimony of Jones and Holland, representatives of the Insurance Company to which the loan was made, all tends to prove that the loan was *bona fide,* made in the usual course and upon gilt-edge security. The evidence to sustain the charge of conspiracy contended for here should be clear and convincing. We do not find it so. Therefore the Bank and Cherry are not liable, no matter what disposition the Insurance Company made of the sum borrowed.

The judgment is correct.

Affirm.

McCULLOCH, C. J., disqualified.

HART, J., concurs in the judgment.